UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-3-19

SHANET VIRUET,

                          Plaintiff,                    16-cv-8327 (JGK)

          - against -                                   MEMORANDUM OPINION
                                                        AND ORDER
CITY OF NEW YORK ET AL.,

                          Defendants.

**JOHN G. KOELTL, District Judge:**

This action is brought pro se by the plaintiff, Shanet
Viruet, a former administrative law judge ("ALJ")[1] for the New
York City Department of Consumer Affairs ("DCA") who is
currently employed as a staff attorney for the DCA. The
plaintiff alleges that the defendants – the City of New York,
the New York City Office of Administrative Trials and Hearings
("OATH"), Local 237 Brotherhood of Teamsters, the Civil Service
Bar Association, and several individuals[2] – engaged in a
conspiracy to silence and retaliate against her for speaking out
against DCA policies. The plaintiff also alleges that the

---

[1] "ALJ" is an informal office title. The plaintiff was formerly employed
as a level three agency attorney. Second Am. Compl. Ex. A.

[2] The individual defendants sued individually and in their capacities as
New York City officials are Bill Blasio, Robert Linn (incorrectly named as
"Robert Flynn"), Fidel Del Valle, Lorelei Salas, Julie Menin, Sanford Cohen,
Jordan Cohen, Tamala Boyd, Matilda Sarpong, Michael Tiger, Maureen Brooks,
and Manuel Menjivar. The plaintiff also brings suit against Saul Fishman, the
president of the Civil Service Bar Association.

1

defendants discriminated and retaliated against her because of
her disability.

The City of New York, OATH, and the city officials
(collectively, the "municipal defendants") have moved to dismiss
the plaintiff's Second Amended Complaint ("SAC") under Federal
Rule of Civil Procedure 12(b)(6) for failing to state a claim
upon which relief can be granted. Local 237 Brotherhood of
Teamsters, the Civil Service Bar Association, and the Civil
Service Bar Association president Saul Fishman (collectively,
the "union defendants") have also moved to dismiss the SAC on
the same ground. The municipal defendants' motion to dismiss is
**granted in part and denied in part.** The union defendants' motion
to dismiss is **granted.**

I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiff's favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007). The Court's function on a motion to dismiss is "not to
weigh the evidence that might be presented at a trial but merely
to determine whether the complaint itself is legally
sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.
1985). The Court should not dismiss the complaint if the
plaintiff has stated "enough facts to state a claim to relief

2

that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, pro se complaints are construed liberally. Dolan v. Connolly, 794 F.3d 290, 293 (2d Cir. 2015).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## II.

### A.

The following facts alleged in the SAC are accepted as true for the purpose of deciding these motions to dismiss.[3]

---

[3] The plaintiff's SAC, her fourth attempt at pleading her case, is a sprawling, sixty-page filing that, in an apparent attempt to obfuscate, is full of generalities and lacks a coherent timeline of events. The allegations

The plaintiff was hired as a DCA ALJ in March 2013 and served in that position until June 27, 2016, when she was placed into a nonadjudicatory role within the DCA. SAC ¶ 13. As an attorney employed by the City of New York, the plaintiff was at all relevant times represented by defendant Local 237 Brotherhood of Teamsters by and through its affiliate, defendant Civil Service Bar Association. Id. ¶¶ 28-29. The plaintiff received a favorable review for her performance as a DCA ALJ for the period between March 11, 2013 and December 31, 2013. SAC Ex. C. Sometime after that, the plaintiff completed her probationary period and was provided tenure. See SAC ¶ 44.

Early in her employment with the DCA, the plaintiff began to express that there were issues with some of the alleged DCA policies. For example, the Deputy Director ordered the plaintiff to change one of her decisions from "not guilty" to "guilty," but the plaintiff would not comply. Id. ¶¶ 34, 36. In early 2014, she "reported [this and other] actions . . . to Mayor de Blasio through public channels." Id. ¶ 34. At a February 11,

---

in the SAC are nonetheless taken as true, the SAC is construed liberally, and all reasonable inferences are drawn in the plaintiff's favor. But the Court notes the point the municipal defendants made in their moving brief:

> Only an attorney, such as plaintiff, cognizant of the elements of each cause of action and working backwards, could create such a fanciful conspiracy involving individuals at all levels of City government (as well as others in plaintiff's own union), whose sole purpose appears to be punishing an employee[(the plaintiff) who] they only recently hired and later awarded tenure.

Municipal Defs.' Mem. at 3.

2014 Pre-K rally in Brooklyn, the plaintiff spoke to First Lady McCray, First Lady McCray's chief of staff, and Mayor de Blasio's assistant, expressing her concerns about being told to change a "not-guilty" decision to "guilty" and her fear of immediate retaliation for refusing to do so. Id. ¶ 36. On March 3, 2014, the plaintiff wrote a letter to Mayor de Blasio about the plaintiff's conversations at the Pre-K rally. Id. ¶ 37. The plaintiff added in the letter that another DCA ALJ was being pressured to leave after speaking out against DCA policies. Id.

The Department of Investigations ("DOI") contacted the plaintiff about a week after she wrote the letter to Mayor de Blasio "because of her correspondence with the Mayor." Id. ¶¶ 38-39. The plaintiff "had multiple conversations" with DOI officials in a hearing room. Id. According to the plaintiff, conversations taking place in the hearing room could be heard from outside the room. Id. A DOI investigator also "scheduled a meeting with [the plaintiff] at a local diner style restaurant." Id.

On March 11, 2014, before the plaintiff's scheduled meeting with the DOI investigator, she was "physically assaulted and verbally threatened by her supervisor." Id. ¶ 39. According to the incident report filed a week later, the plaintiff's supervisor bumped the plaintiff in the hall and a few seconds later turned around and said, "What?" SAC Ex. I. The plaintiff's

5

supervisor denied that the contact was intentional, and the supervisor was not punished. SAC ¶ 40. About three months after the alleged assault, the plaintiff was "reprimanded" by defendant Sanford Cohen in a memorandum for reporting the incident. Id.; Municipal Defs.' Ex. 3.[4] Also around this time, the supervisor who allegedly assaulted the plaintiff was reassigned to review the plaintiff's work. SAC ¶ 40. Moreover, on the same day that the plaintiff was allegedly assaulted, the plaintiff "was assigned a case which further presented a risk to [her] safety." Id. ¶ 41. Despite these events, the plaintiff "continued to speak out regarding matters of public concern through channels available to the public." Id. ¶ 42.

Sometime between March and October 2014, the DCA deputy director of adjudication allegedly adopted a policy requiring the ALJs to impose maximum fines in their cases. Id. ¶¶ 120–21. The plaintiff spoke out against this policy, id. ¶ 123, although it is unclear when, to whom, and through what channels.

The plaintiff alleges that she was not the only DCA ALJ to speak out about the various policies and practices of the DCA. She states that "[b]etween the spring of 2012 and summer of 2015 at least half of the eight (8) DCA Judges spoke out through

---

[4] The memorandum expressed doubt about the validity of the plaintiff's account of the alleged assault and questioned her motives for reporting the incident. See Municipal Defs.' Ex. 3. It is not clear that the plaintiff was formally reprimanded.

channels available to the public on matters of public concern –
including the unconstitutional discriminatory and egregious
tactics employed against [ALJs] for speaking out." Id. ¶ 3.

Between June 8 and 12, 2015, the municipal defendants began
training hearing officers to adjudicate the same cases that the
DCA ALJs adjudicated. Id. ¶ 48. At the same time, DCA ALJs were
told that the DCA's adjudicatory functions were going to be
transferred to OATH and that the ALJs would likely lose their
DCA jobs if they did not agree to transfer to a different
agency. Id. ¶¶ 49, 51. The transfer of DCA adjudicatory
functions to OATH was set to begin in August 2015. Id. ¶ 51.
Between June 2015 and June 2016, the defendants "engaged in
concerted efforts to start and stop the DCA adjudications
hearing calendar" to accommodate the transfer of adjudicatory
functions. Id. ¶ 58.

The New York City Office of Labor Relations ("OLR")
contacted the plaintiff on August 31, 2015, stating that the
office received her resume, had an open hearing officer
position, and thought she might fit the position. Id. ¶ 97. The
plaintiff, however, alleges that she did not provide the OLR
with her resume. She further alleges that in November 2015 "and
[on] other occasions," the union defendants provided the OLR
with her resume, without her consent, so she could be considered
for other jobs. Id. ¶ 97. Indeed, "other City agencies reached

7

out to [the plaintiff] regarding positions because [the] Defendants disseminated her resume to them as well." Id. ¶ 98. But the plaintiff refused to leave her post at the DCA. By February 8, 2016, the plaintiff was the only DCA ALJ judge who had not accepted new employment. Id. ¶ 64. The plaintiff "continued to speak out" to the defendants about her belief that the transfer of DCA ALJs was retaliatory conduct to punish the ALJs for speaking out against DCA policies and practices. Id. ¶ 68. She also "continued to speak out" about "the harm to the public resulting from stalling the transfer [of DCA adjudicatory functions] while issuing charges and refusing to adjudicate cases which have fines that accumulate daily until any hearing date set by the agency." Id.

On March 30, 2016, the DCA acting commissioner ordered the plaintiff to begin working "for the legal division," located at 42 Broadway, rather than 66 John Street, where she typically worked. Id. ¶ 67. The plaintiff has a disability that inhibits her "major bodily functions," her mobility, and her "ability to perform major life activities." Id.; Dkt. No. 42 ¶ 129. The plaintiff alleges that the defendants knew about this disability "at least since 2014" and that the DCA acting commissioner was aware that the plaintiff had sought an accommodation due to her disability. SAC ¶¶ 67, 140. She claims that 42 Broadway is more difficult for her to get to than 66 John Street.

On May 4, 2016, a Labor Management Meeting was held between representatives of the hearing officers and of the City of New York. SAC Ex. M at 1. According to the meeting minutes, OATH was waiting for Mayor de Blasio to sign an executive order that would bring the DCA into OATH. Id. At the time of the May 4 meeting, DCA hearings were not being held and it was anticipated that they would resume in a couple of months. Id. These hearings would take place at 66 John Street, the location where the plaintiff typically worked as a DCA ALJ. Id.; see SAC ¶ 130. Meanwhile, hearing officers would be trained to handle DCA and other agency cases. See SAC Ex. M at 1. The meeting minutes also noted that "OATH is expecting a huge increase in its caseload that would result from the Criminal Justice Reform Act, the law decriminalizing violations deemed minor offenses . . . . This explains why OATH is hiring new judges and buying real estate . . . ." Id. at 2.

On June 23, 2016, Mayor de Blasio issued Executive Order 18, which transferred adjudications within the DCA's jurisdiction to OATH. Municipal Defs.' Ex. 1. The next day, the City of New York and the Civil Service Bar Association entered into a memorandum of agreement ("the MOA") which, among other things, memorialized the DCA ALJs' transfer to various agencies. Municipal Defs.' Ex. 2. The ALJs' transfers were made pursuant to New York State Civil Service Law ("NYSCSL") § 70(6), and the

MOA stated that "[e]mployees transferred pursuant to this
Agreement shall have all prior City service deemed to be
continuous City service, to the same extent as if the employee
had been transferred pursuant to [NYSCSL] § 70(2)." Id. The MOA
also stated that the transferred employees "will receive the
same civil service protections as if they had been transferred
pursuant to [NYSCSL] § 70(2)." Id. The MOA was signed by
defendant Robert Linn and defendant Saul Fishman, the president
of the Civil Service Bar Association. Id. The plaintiff alleges
that the defendants did not notify her that the MOA existed
until January 5, 2017 and did not produce the MOA to her until
February 15, 2017. SAC ¶ 72.

According to the plaintiff, the union defendants all
colluded with the municipal defendants to bring the MOA into
effect. Id. ¶ 104. The plaintiff alleges that the union
defendants did so to retaliate against the DCA ALJs – whom the
union represented – for speaking out "on matters of public
concern." Id. ¶ 106. As evidence of this conspiracy, the
plaintiff claims that the union defendants did not help the DCA
ALJs fight against their transfers to other agencies and
pressured the plaintiff out of her DCA ALJ job by giving her
resume to other city agencies. See id. ¶¶ 87, 97–98, 103–17.

On June 27, 2016, the plaintiff was placed into a
nonadjudicatory position within the DCA. Id. ¶¶ 13, 130. She

initially held this position as a "senior attorney" but has since been demoted to "staff attorney." Id. ¶ 13. It is not clear from the SAC when the plaintiff was demoted, but she was ultimately demoted to "the lowest attorney civil service title" and "the lowest pay grade." Id. ¶ 139. In a letter to the Court, the plaintiff stated that the demotion and reduction in salary occurred on May 5, 2017. Dkt. No. 30.

The plaintiff alleges that after she assumed a nonadjudicatory role within DCA, the defendants increased the retaliation against her because of her speaking out. Id. ¶ 130. She adds that the defendants targeted her disability to cause her physical pain and began working together to create a hostile work environment. See id. ¶ 137.

Upon starting in her new role, the plaintiff alleges that she was required to work from 42 Broadway even though she had a disability and it was easier for her to work from 66 John Street – the location which was set to house DCA adjudications. Id. ¶ 130; see SAC Ex. M. Defendant Tamala Boyd, a general counsel of DCA, told the plaintiff that the City could not accommodate her request to work from 66 John Street. SAC ¶ 130. Boyd was also allegedly flippant about the plaintiff's disappointment with her nonadjudicatory role at the DCA. See id. ¶¶ 113, 130. At 42 Broadway, the plaintiff "was assigned to a cubicle with a

desk that was significantly smaller than her standard size stand-alone desk." Id. ¶ 131.

The plaintiff filed a disability-discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") in the summer of 2016 regarding her transfer to 42 Broadway and her smaller workspace. Id.; Municipal Defs.' Ex. 5.[5] After filing this complaint, her supervisor, defendant Matilda Sarpong, "increased [the plaintiff's] workload, forcing her to []re-type[]work already completed by the entire adjudications support staff and two attorneys over the course of many months . . . and still refused to provide her with even a temporary desk." SAC ¶ 132. Defendant Sarpong also allegedly berated the plaintiff in front of their colleagues about the plaintiff's disability in a manner designed to humiliate her, and wrote the plaintiff a disciplinary warning for sitting at a "free desk . . . which others were allowed to use without incident." Id. At this time, the plaintiff was wearing an arm sling after sustaining a shoulder injury allegedly caused by her workstation. Id.

Months after the plaintiff began her nonadjudicatory role within the DCA at 42 Broadway, the defendants placed her in a new office that faced an enclosed air shaft and had a recurring

---

[5] The plaintiff does not state when she filed this EEOC complaint. However, correspondence from the EEOC notifying the DCA of the plaintiff's complaint is dated August 9, 2016, and concerns circumstances of alleged discrimination occurring on July 25, 2016. See Municipal Def.s' Ex. 5 at 1.

leak. Id. ¶ 133. "Other attorneys had complained about the air
quality including the smell of the office and were moved out of
the office without issue to one . . . of the other offices along
the corridor in an area facing a window open to the street." Id.
In February 2017, the plaintiff developed a respiratory illness.
Id. ¶ 134. Her new supervisor, defendant Jordan Cohen, then
placed her in a different, empty office. Id. After the plaintiff
was moved into this new office, sometime in February 2017,
defendant Boyd shouted at the plaintiff in front of her
colleagues, making statements regarding the plaintiff's medical
information and accommodation request, and then ordered the
plaintiff to leave the building, believing that the plaintiff
was not medically cleared to return to work. Id. ¶ 137. Boyd
also shouted to the plaintiff that "nobody likes you here" and
"everybody here hates working with you," and pulled the plug out
of the plaintiff's computer and "tried to remove [the
plaintiff's] personal belongings." Id. ¶ 134. According to the
plaintiff, around this time the defendants increased their
mistreatment of her "under the direction of senior staff
including . . . Boyd." Id. ¶ 137.

Soon after the incident between the plaintiff and Boyd, the
plaintiff was given another office that was "adjacent" to the
same enclosed airshaft that her earlier problematic office
faced. Id. ¶ 135. In November 2017, "work was performed on what

was described as the 'electrical sensor' and other components of the circulated air system in [the plaintiff's] work area." Id. ¶ 136. According to the plaintiff, there are better, empty workstations available, but the defendants have refused to transfer her to one of them. Id.

The plaintiff further alleges that rather than accommodate her disability-related requests immediately, her employer made her attend a meeting to discuss her requests with defendants Manuel Menjivar, Jordan Cohen, Maureen Brooks, and Michael Tiger. Id. ¶ 137. The plaintiff "was berated during the meeting by multiple attendees and informed that – although they each had the medical documentation and a determination was made that she would not be allowed to sit at any other workstation other than the two stations against her physicians' recommendations – they had not reviewed the documentation or made a determination regarding her accommodation request." Id.

The plaintiff was later demoted without warning and her pay was reduced. Id. The plaintiff alleges that this demotion was in retaliation "for [her] speaking out" and was made to "frustrate her ability to speak out and obtain counsel." Id. ¶ 139. Although the plaintiff does not specify when this demotion took place, in a letter to the Court, the plaintiff stated that the demotion and reduction in salary occurred on May 5, 2017. Dkt. No. 30.

Additionally, the plaintiff claims that other employees have periodic meetings with their supervisors regarding their work, but she has never been provided with such meetings. Id. ¶ 138. The plaintiff also alleges that, until November 2017, she "was removed from all duties involving the practice of law and forbidden to communicate with members of the public with regards to her tasks." Id. Finally, the plaintiff alleges that, at some unspecified time, she experienced "harassment regarding sick leave, delay[ed] pay increases, [and] delay[ed] retroactive pay." Id. ¶ 43; see Dkt. No. 42 ¶¶ 135-36.

According to the plaintiff, other DCA ALJs who spoke out against DCA policies and practices experienced similar mistreatment and retaliation by the defendants. SAC ¶¶ 2-4, 141-45.

**B.**

The plaintiff brings the following causes of action, apparently against all the defendants indiscriminately:

- Deprivation, without due process, of her right to perform her job as an ALJ, brought under 42 U.S.C. § 1983;
- First Amendment retaliation, brought under 42 U.S.C. § 1983;
- Retaliation pursuant to New York State Constitution Article I, § 8;
- Disability-discrimination and failure to accommodate brought under the Americans with Disabilities Act ("ADA");

- Disability-discrimination brought under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL");
- Disability-related retaliation; and
- Hostile work environment.

Id. ¶¶ 137-50. The defendants all contest each of these claims.

### III. The Plaintiff's Constitutional Claims

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendants, while acting under color of state law, denied the plaintiff a constitutional or federal statutory right. West v. Atkins, 487 U.S. 42, 48 (1988).

### A. Due Process

The plaintiff claims that the transfer of the DCA's adjudicatory function to OATH deprived her of her job duties as an adjudicator without due process. Specifically, she claims that (1) she has a constitutionally protected property interest in her job duties and (2) the transfer of functions memorialized in the MOA should have been done under NYSCSL § 70(2), which states that when a function is transferred among agencies, "provision shall be made for the transfer of necessary officers and employees who are substantially engaged in the performance of the function to be transferred." In other words, she argues that she should have been transferred under § 70(2) and therefore allowed to keep her job duties but, because she was not, she was unconstitutionally deprived of those duties.

Although the plaintiff's job duties changed with her reassignment, the plaintiff does not allege that her salary and benefits were reduced upon her reassignment. Therefore, she has failed to allege the denial of a constitutionally protected property interest. See Adams v. N.Y. State Educ. Dep't, 752 F. Supp. 2d 420, 453 (S.D.N.Y. 2010) ("An employee who continues to be paid cannot sustain a claim for deprivation of property without due process even if relieved from job duties." (quotation marks omitted)), aff'd sub nom. Ebewo v. Fairman, 460 F. App'x 67 (2d Cir. 2012); see also Barnes v. Pilgrim Psychiatric Ctr., 860 F. Supp. 2d 194, 204 (E.D.N.Y. 2012) ("[E]mployees who are reassigned to report to locations where they are prevented from performing their usual functions, while continuing to receive full salary and benefits, state no claim for deprivation of a Constitutionally protected right.").

Moreover, NYSCSL § 70(2) does not create a protectable interest in the plaintiff's job duties, and the plaintiff cites no authority in support of such a proposition. The MOA expressly states that the DCA's transfer of adjudicatory functions was done pursuant to § 70(6), not § 70(2). Section 70(6) provides that "[n]otwithstanding . . . any other provision of law, any city having a population of one million or more may by agreement negotiated between such city and an employee organization . . . provide for the involuntary transfer of employees between city

agencies." Therefore, any alleged property interest formed under § 70(2) is irrelevant because that provision was not the operative provision in the transfer of functions in this case. See Minerva v. Cty. of Suffolk, No. 15cv6433, 2017 WL 395209, at *4-6 (E.D.N.Y. Jan. 30, 2017) (holding that any interests protected under § 70(2) did not apply because the transfer at issue took place under § 70(7)). And the SAC contains no allegations that effectuating the transfer through § 70(6) rather than § 70(2) was impermissible.[6]

Accordingly, because the plaintiff has not alleged a constitutionally protected interest of which she was deprived without due process, her 42 U.S.C. § 1983 due process claim is **dismissed** with respect to all the defendants.

## B. First Amendment Retaliation

### 1. Against the Union Defendants

The union defendants are private actors rather than state actors. However, 42 U.S.C. § 1983 "has been found to reach the conduct of non-governmental actors whose actions are fairly attributable to the state." Srubar v. Rudd, Rosenberg, Mitofsky & Hollender, 875 F. Supp. 155, 163 (S.D.N.Y. 1994), aff'd, 71

---

[6] The plaintiff contends in her opposition brief that § 70(6), which allows the involuntary transfer of employees between agencies, cannot provide the basis for the transfer because the MOA only provided for voluntary transfers (the other DCA ALJs) and one intra-agency transfer (the plaintiff). The plaintiff also argues that it was Executive Order 18, not the MOA, that initiated the transfer. But the plaintiff does not explain why either of these arguments would render the MOA and its use of § 70(6) inapplicable.

F.3d 406 (2d Cir. 1995). A plaintiff may state a § 1983 claim against a non-governmental actor where there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Kohlhausen v. SUNY Rockland Cmty. Coll., No. 10cv3168, 2011 WL 2749560, at *6 (S.D.N.Y. July 13, 2011) (quotation marks omitted). Joint action can be shown through a plan or conspiracy "such that the state or its agents do not exercise judgment independent of the non-state actor." Id. "In turn, '[t]o state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act.'" Id. (alteration in original) (quoting Ciambriello v. County of Nassau, 292 F.3d 307, 324 (2d Cir. 2002)).

In this case, the plaintiff has not alleged anything that plausibly supports her assertion that the union defendants acted in concert with the municipal defendants to commit the allegedly unconstitutional act left at issue – retaliation in violation of the First Amendment. The plaintiff claims that the union defendants effectuated the transfer of DCA adjudicatory functions to OATH through the MOA to silence DCA ALJs speaking out against DCA practices and policies. As evidence, she alleges that the union defendants gave other agencies her resume to

assist her in obtaining a different job, did not disclose the MOA immediately, and in various, nondescript ways did not resist the transfer of adjudicatory functions to OATH. But the plaintiff cites no direct or circumstantial evidence to support her allegation that the union defendants acted in concert with the municipal defendants to retaliate against her for the exercise of her First Amendment rights. Rather, on the face of the SAC, the plaintiff showed that the union defendants acted to protect the jobs of all the workers affected by the City's reorganization. There is no evidence of retaliation in violation of the First Amendment. See Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; [d]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." (quotation marks omitted, second alteration in original)), overruled on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993).

Because the alleged actions of the union defendants are not state action in violation of the First Amendment, the plaintiff's 42 U.S.C. § 1983 First Amendment retaliation claim against the union defendants is **dismissed.**

## 2. Against the City of New York, OATH, and the Individuals in their Official Capacities

A municipality, its agencies, and its officials sued in their official capacities are liable under 42 U.S.C. § 1983 only if the challenged conduct was "performed pursuant to a municipal policy or custom." Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004); Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992); see generally Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 669 (1978). To identify a "policy or custom," the plaintiff must demonstrate that the municipality, through its deliberate conduct, was the "moving force" behind the injuries alleged. Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997). The alleged policy does not need to be contained in an explicitly adopted rule so long as the unlawful practices of city officials are so "persistent and widespread . . . as to constitute a custom or usage with the force of law." Sorlucco, 971 F.2d at 870 (quotation marks omitted); see Connick v. Thompson, 563 U.S. 51, 61 (2011) (stating that the acts of city officials must be "so persistent and widespread as to practically have the force of law").

In this case, the plaintiff has not alleged sufficiently that it is New York City policy to retaliate against DCA ALJs that take issue with departmental policies and practices, or that city officials engage in "persistent and widespread"

practices to carry out such retaliation. First, the plaintiff's speculative allegation that the city transferred DCA adjudications to OATH as a means of retaliation – if that could be considered a "policy or custom" – is insufficient. There remains the more plausible explanation that the City simply found it wise to consolidate functions and did so by transferring DCA adjudications to OATH, to be heard by hearing officers trained to hear matters across a variety of agencies. See SAC Ex. M. The plaintiff cites no facts to support a malign interpretation of the reorganization.

Moreover, the plaintiff provides no link between her (and, as vaguely alleged, a few other ALJs') speaking out against DCA policies and practices and the transfer. In fact, the plaintiff alleges facts suggesting that the transfer was not carried out for any sort of retaliatory purpose. The SAC indicates that the City and its officials went to great lengths to find the DCA ALJs – including the plaintiff – comparable employment within the City's other agencies. Further, the MOA memorialized the protection of the transferees' rights. See Municipal Defs.' Ex. 2 (stating that the transferred employees "will receive the same civil service protections as if they had been transferred pursuant to [NYSCSL] § 70(2)"). This undercuts the plaintiff's theory that the transfer was retaliatory.

The plaintiff has also not alleged a persistent and widespread practice among city officials to retaliate against the DCA ALJs. The plaintiff alleges limited instances of retaliation – not just for her speaking out but also for her requesting accommodations for her disabilities – carried out over more than three years, in wildly varying degrees, by limited employees of the DCA. The plaintiff's allegations fall well short of pleading that the acts of the city officials were "so persistent and widespread as to practically have the force of law." See Connick, 563 U.S. at 61.

Because the plaintiff has not alleged a sufficient policy or custom under Monell, the City of New York, OATH, and the individual defendants sued in their capacities as city officials cannot be held liable for the alleged First Amendment retaliation. The plaintiffs 42 U.S.C. § 1983 First Amendment retaliation claim is therefore **dismissed** with respect to those defendants.

### 3. Against the Individual Municipal Defendants Sued in their Individual Capacities.

The plaintiff's First Amendment retaliation claim remains only against the individual municipal defendants sued in their individual capacities. To prevail on a First Amendment retaliation claim, a public employee must establish (1) that she has engaged in protected First Amendment activity, (2) suffered

23

an adverse action, and (3) there was a causal connection between the protected activity and the adverse action.[7] Denicolo v. Bd. of Educ. of City of N.Y., 328 F. Supp. 3d 204, 215 (S.D.N.Y. 2018). The relevant defendants contest each factor and claim that qualified immunity shields them from liability.[8]

### a. Protected Speech

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). "A public employee, however, must 'by necessity accept certain limitations on his or her freedom,' because, his or her speech can contravene governmental policies or impair the proper performance of governmental functions." Weintraub v. Bd. Of Educ. of City Sch. Dist. of City of N.Y., 593 F.3d 196, 201 (2d Cir. 2010) (alterations omitted) (quoting Garcetti, 547 U.S. at 418-19). "The Supreme Court's employee-speech jurisprudence reflects 'the common sense realization[s] that government offices could not function if every employment decision became a constitutional matter,' and that 'government officials should

---

[7] The plaintiff also alleges retaliation under New York State Constitution Article I, § 8. The analysis under the United States and New York State Constitutions is the same. Denicolo v. Bd. of Educ. of City of N.Y., 328 F. Supp. 3d 204, 215 (S.D.N.Y. 2018).

[8] Because, for the reasons explained, the plaintiff has failed to state a First Amendment retaliation claim, the Court does not consider the defendants' qualified immunity defense.

enjoy wide latitude in managing their offices without intrusive oversight by the judiciary in the name of the First Amendment.'" Id. at 201 (quoting Connick v. Myders, 461 U.S. 138, 143, 146 (1983)). "Accordingly, the Supreme Court has strived 'to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id. at 201 (quoting Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968)).

With those principles in mind, the Supreme Court in Garcetti clarified that to bring a claim for violation of the First Amendment, a public employee must first establish that the employee spoke "as a citizen on a matter of public concern." 547 U.S. at 418. If not, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Id. Only when the public employee speaks as a citizen on a matter of public concern is the speech protected by the First Amendment; if that requirement is met, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id.

Garcetti further clarified that "when public employees make statements pursuant to their official duties, the employees are

not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline." Id. at 421. Speech is made "pursuant to" the public employee's duties when it is "part-and-parcel" of the employee's concerns about her ability to properly execute her duties. Weintraub, 593 F.3d at 203. Such speech is not made by the public employee "as a citizen on a matter of public concern" and thus does not trigger First Amendment protection. Garcetti, 547 U.S. at 418; see Lee-Walker v. N.Y.C. Dep't of Educ., 220 F. Supp. 3d 484, 490-91 (S.D.N.Y. 2016), aff'd sub nom. Lee-Walker v. N.Y.C. Dep't of Educ., 712 F. App'x 43 (2d Cir. 2017).

Finally, the channel through which a public employee speaks is influential in determining whether the communication is protected. In Weintraub, for example, the Second Circuit Court of Appeals distinguished between "[t]he lodging of a union grievance," which "is not a form or channel of discourse available to non-employee citizens," and "a letter to the editor or a complaint to an elected representative or inspector general," which is such a channel. 593 F.3d at 204. In holding that the plaintiff's speech was not protected, the Weintraub court found significant the plaintiff's decision to file a grievance internally through "an existing dispute-resolution policy established by his employer" rather than "through channels available to citizens generally." Id.

The defendants argue that none of the plaintiff's statements are protected because all her communications arose out of her job duties. But, at the motion to dismiss stage, this Court cannot find that none of the plaintiff's statements qualify for First Amendment protection.

For example, the plaintiff alleges that in early 2014 she reached out to Mayor de Blasio, First Lady McCray, First Lady McCray's chief of staff, Mayor de Blasio's assistant, and the DOI concerning pressure from her supervisor to change a not-guilty decision to a guilty one and the DCA's alleged policy of harassing ALJs who did not comply with orders they believed to be unlawful. These statements, as alleged, concern more than the plaintiff's official duties and her ability to do her job – the plaintiff was suggesting to public officials that the DCA was not following the law and was attempting to silence dissenters. Cf. Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed., 444 F.3d 158, 164–65 (2d Cir. 2006) (holding that the First Amendment protected a high school athletic director's letter to his supervisor and to the school board criticizing the school district's handling of a sexual harassment and hazing incident involving the high school football team); see also Weintraub, 593 F.3d at 204 (noting that lodging "a complaint to an elected representative or inspector general" uses a channel of discourse available to nonemployee citizens).

The plaintiff has also alleged that she complained about the transfer of the DCA's adjudicatory functions and the harm resulting from the DCA issuing daily fines while cases were held in abeyance during the transfer, although it is unclear what channels the plaintiff used to complain about these issues. While it is not clear when the plaintiff complained about these issues or to whom, it appears that the plaintiff alleges she spoke about these issues before the summer of 2016.

Finally, throughout the complaint, the plaintiff summarily states and restates without context that she spoke out "on matters of public concern," sometimes adding that she did so "through channels available to the public." See, e.g., SAC ¶¶ 2, 42. These vague, conclusory allegations are insufficient to support a claim. See Ricci v. Teamsters Union Local 456, No. 13cv7729, 2014 WL 11353151, at *1 (S.D.N.Y. Apr. 28, 2014) ("[M]ere recitals of the elements of a cause of action, supported only by conclusory statements, are not sufficient" to state a claim."), aff'd, 781 F.3d 25 (2d Cir. 2015).

In sum, the plaintiff has alleged adequately that the following communications are protected by the First Amendment: (1) her communications, made in early 2014, related to pressure from her supervisor to change a not-guilty decision to a guilty one and the DCA's policy of harassing ALJs who did not comply with orders they believed to be unlawful; and (2) her

communications, apparently made between early 2016 and summer 2016, concerning her theory that the DCA's adjudicatory functions were transferred to OATH to silence DCA ALJs who did not agree with DCA policies and regarding the harm resulting from the DCA issuing daily fines while cases were held in abeyance during the transfer. As pleaded, all other alleged communications cannot be deemed as protected under the First Amendment.

### b. Adverse Action

The second element of a First Amendment retaliation claim requires an adverse action to take place. In assessing this second element, courts should focus on whether the alleged retaliatory acts "would plausibly deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Murray v. Town of N. Hempstead, 853 F. Supp. 2d 247, 264 (E.D.N.Y. 2012). The plaintiff can meet this factor by stating an "adverse employment action" or an "adverse action" that "is not limited to discriminatory actions that affect the terms and conditions of employment." See Rivers v. N.Y.C. Hous. Auth., 176 F. Supp. 3d 229, 244–45 (E.D.N.Y. 2016) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006)), aff'd sub nom. Crenshaw v. N.Y.C. Hous. Auth., 697 F. App'x 726 (2d Cir. 2017).

"Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. [Although] lesser actions may also be considered adverse employment actions[,] . . . they must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Murray, 853 F. Supp. 2d at 264 (citations and quotations marks omitted). "Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a longer period of time may be actionable if they attain the critical mass of unreasonable inferiority." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002). Adverse retaliatory actions not tied to the terms and conditions of one's employment necessarily encompass a broader range of activity than employment-related adverse actions. See Rivers, 176 F. Supp. 3d at 244-45.

"Retaliation claims brought under [42 U.S.C.] § 1983 must be asserted within three years of the offending acts." Birch v. City of New York, 675 F. App'x 43, 44 (2d Cir. 2017). The defendants contend, and the Court agrees, that the plaintiff raised her First Amendment retaliation claim for the first time in her proposed SAC on November 7, 2017. The plaintiff does not respond to this argument. Thus, only retaliatory acts occurring after November 7, 2014 can be actionable. The Court therefore cannot consider the alleged March 11, 2014 assault, the

30

assignment of a case to the plaintiff on the same day that allegedly threatened her safety, the subsequent memorandum "reprimanding" the plaintiff for reporting the alleged assault, or the fact that the supervisor who allegedly assaulted the plaintiff was reassigned shortly thereafter to review the plaintiff's work.

The plaintiff's demotion and accompanying pay reduction,[9] which she alleges were carried out by defendants Michael Tiger and Jordan Cohen during the statutory period, are adverse actions. The rest of the SAC alleges only relatively minor incidents involving the other individual defendants. These claims are insufficient to plead an adverse action – that is, they do not add up to a "critical mass" – with respect to the remaining individual defendants.[10] See Phillips, 278 F.3d at 109.

_____

[9] One part of the SAC appears to allege that the plaintiff was demoted twice after she was reassigned within in the DCA: one demotion from "senior attorney" to "senior staff attorney," and another from "senior staff attorney" to "staff attorney." See SAC ¶ 13. However, the SAC only recounts the facts surrounding one demotion, and later appears to suggest that the plaintiff was only demoted once. See id. ¶¶ 138–39. That demotion occurred in May 2017. Dkt. No. 30.

[10] The plaintiff alleges that Sarpong increased the plaintiff's workload by forcing her to retype her work, did not provide her with a temporary workstation that fit her needs, and constantly berated her. The plaintiff does not allege how often this occurred and over what period of time. Although these allegations could state an adverse action for purposes of First Amendment retaliation, the plaintiff alleges no causal link between her protected statements and Sarpong's conduct. Rather, the plaintiff alleges that Sarpong's conduct was in retaliation for the plaintiff's filing an EEOC complaint related to disability discrimination and requesting accommodation for her disability.

While the plaintiff has alleged various actions by Boyd, they do not amount to a sufficient critical mass to constitute an adverse action. The plaintiff makes the following allegations against Boyd: (1) in late June 2016, Boyd was flippant about the plaintiff's disappointment over her new, nonadjudicatory role in the DCA; (2) at some unspecified time, Boyd refused to accommodate the plaintiff's request to work at 66 John Street rather than 42 Broadway; and (3) in a February 2017 incident, Boyd aggressively and loudly ordered the plaintiff to leave work because Boyd believed the plaintiff was not medically cleared to return, thereby disclosing information related to the plaintiff's medical conditions and disability accommodation requests to those within earshot, and then pulled the plug out of the plaintiff's computer.[11] These alleged acts, occurring over a relatively short period, do not constitute an adverse action. The plaintiff also alleges in a conclusory manner that other employees mistreated her "under the direction of senior staff including . . . Boyd." SAC ¶ 137. But these allegations are too conclusory to constitute factual allegations of adverse actions.

---

[11] The plaintiff has not pleaded any facts suggesting that Boyd's conduct was in any way related to the plaintiff's speaking out on matters of public concern.

Thus, the only adverse action that the plaintiff pleaded sufficiently was her demotion and reduction in pay, which were carried out by Tiger and Jordan Cohen in May 2017.

### c. Causation

The plaintiff must show that there is a causal connection between her protected speech and the adverse actions. "[T]he causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse . . . action." Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir. 1994). At the motion to dismiss stage, "a reasonable inference is all that is required. However, a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed." Estate of Smith v. Town of W. Hartford, 186 F. Supp. 2d 146, 156 (D. Conn. 2002) (citations and quotation marks omitted).

"[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the adverse . . . action.'" Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)). However, there is no "bright line [that] define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a

federal constitutional right and an allegedly retaliatory action." See id. (comparing a case in which an eight-month gap suggested a causal connection with a case in which a three-month gap suggested no causal connection).

The plaintiff has sufficiently pleaded two sets of communications that are protected under the First Amendment and one adverse action. The two sets of communications are (1) those made in early 2014 to Mayor de Blasio, the DOI, and others, regarding her supervisor pressuring her to change a "not-guilty" decision to "guilty" and the DCA's policy of harassing ALJs who did not comply with orders they believed to be unlawful; and (2) her communications made between early 2016 and summer 2016 concerning her theory that the DCA's adjudicatory functions were transferred to OATH to silence DCA ALJs who did not agree with DCA policies and regarding the harm resulting from the DCA issuing daily fines while cases were held in abeyance during the transfer. The adverse action is the plaintiff's demotion and reduction in pay, which occurred in May 2017. The plaintiff has failed to plead facts supporting adequate causation between either of the protected communications and this adverse action.

The plaintiff pleads no facts suggesting a link between her early 2014 communications and her May 2017 demotion, and there is no temporal proximity. Therefore, the 2014 communications are not a basis for a First Amendment retaliation claim. Similarly,

the plaintiff has alleged no facts suggesting that her 2016 comments about the transfer of DCA adjudicatory functions, the alleged harassment of dissenting DCA ALJs, and the impropriety of holding DCA cases in abeyance during the transfer were a "substantial motivating factor" in her May 2017 demotion. There is no temporal proximity because almost a year separated the events. And there are no other factors that support causality. There are no facts pleaded to show that the people who demoted the plaintiff were at all involved in her complaints about the transfer of adjudicatory functions from DCA ALJs to OATH.

Therefore, the plaintiff's 42 U.S.C. § 1983 First Amendment retaliation claim against the remaining set of defendants – the individual municipal defendants sued in their individual capacities – is **dismissed.**

## IV. The Plaintiff's Disability-Discrimination Claims

The plaintiff alleges that the defendants discriminated against her because of her disability. She brings claims for disability-discrimination under the ADA, NYSHRL, and NYCHRL; failure to accommodate under only the ADA; and retaliation, but she does not specify the statutes under which she brings her retaliation claim or whether she brings the claim against the individual defendants. Each of the claims is simply asserted against all of the defendants.

### A. ADA Claims Against the Individual Defendants

"Individuals cannot be named as defendants in ADA suits in either their official or representative capacities." Carrasquillo v. City of New York, 324 F. Supp. 2d 428, 441 (S.D.N.Y. 2004). Accordingly, all the plaintiff's claims brought under the ADA against the individual defendants are **dismissed.**

### B. All Discrimination Claims Against the Union Defendants and Defendant OATH

The SAC has failed to plead any facts suggesting that the union defendants or OATH discriminated or retaliated against the plaintiff in any way because of her disability. All discrimination claims against the union defendants and OATH are therefore **dismissed with prejudice.**

### C. Discrimination Under the ADA, NYSHRL, and NYCHRL

Discrimination claims can be brought against individuals under the NYSHRL and the NYCHRL but not under the ADA. See Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004). The same legal standards apply to claims of disability-discrimination under the ADA and the NYSHRL. See Penberg v. HealthBridge Mgmt., 823 F. Supp. 2d 166, 181 (E.D.N.Y. 2011). Therefore, the Court assesses together whether the plaintiff has asserted a disability-discrimination claim against the City under the ADA and against the City and the individual municipal defendants under the ADA and the NYSHRL. The NYCHRL disability-

discrimination claim will be assessed separately. <u>See</u> <u>Smith v.</u> <u>Reg'l Plan Ass'n, Inc.</u>, No. 10cv5857, 2011 WL 4801522, at *7 (S.D.N.Y. Oct. 7, 2011) (stating that NYCHRL discrimination claims must be assessed separately from ADA and NYSHRL discrimination claims).

### 1. Discrimination Claims under the ADA and NYSHRL

To state a disability-discrimination claim under the ADA and NYSHRL, the plaintiff must allege that (1) her employer is covered by the statutes, (2) she suffers from or is regarded as suffering from a qualifying disability, (3) she was qualified to perform the essential functions of her job with or without reasonable accommodation, and (4) she suffered an adverse employment action because of her disability or perceived disability. <u>Capobianco v. City of New York</u>, 422 F.3d 47, 56 (2d Cir. 2005).

On a motion to dismiss, a plaintiff "need not allege specific facts establishing a <u>prima facie</u> case of employment discrimination or otherwise meet a heightened pleading standard. Instead, the complaint must assert enough facts to state a claim to relief that is plausible on its face." <u>Lee v. Sony BMG Music</u> <u>Entm't, Inc.</u>, 557 F. Supp. 2d 418, 424 (S.D.N.Y. 2008) (quotation marks and citations omitted); <u>see</u> <u>Littlejohn v. City</u> <u>of New York</u>, 795 F.3d 297, 311 (2d Cir. 2015). The defendants dispute only the fourth factor of the factors listed above. They

contend that the plaintiff did not suffer an adverse employment action and, if she did, there was no causal relation between her disability and the adverse action.

In the employment-discrimination context, an "adverse employment action" is a "materially adverse" change in the terms and conditions of employment, such as a demotion evidenced by a reduction in pay or "a significant diminishing of the employee's material responsibilities." Kelly v. N. Shore-Long Island Jewish Health Sys., 166 F. Supp. 3d 274, 285–86 (E.D.N.Y. 2016); see Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). But a "bruised ego" or "reassignment to a position that is more inconvenient" does not constitute adverse employment actions. Kelly, 166 F. Supp. 3d at 286.

The plaintiff's demotion and reduction in pay, which she alleges was carried out by defendants Michael Tiger and Jordan Cohen, qualifies as an adverse employment action. But the minor incidents carried out by the other individual defendants do not; they cannot be considered a materially adverse change in the conditions of employment and the plaintiff does not provide any reason to find that any of these incidents were connected to her disability. Nor do the alleged delays in pay increases and retroactive pay that the plaintiff experienced qualify as adverse employment actions. See Godfrey v. N.Y.C. Transit Auth., No. 02cv2101, 2009 WL 3075207, at *10 (E.D.N.Y. Sept. 23, 2009)

("[M]inor stumbling blocks, including mere delays in granting employment benefits, do not amount to adverse employment action under the ADA." (quotation marks omitted)). Indeed, she provides no facts about when or under what circumstances these alleged delays occurred. Moreover, although the plaintiff's transfer within the DCA to a nonadjudicatory role might constitute an adverse employment action, the plaintiff does not allege that this transfer was related in any way to her disability. Finally, with respect to the plaintiff's complaint that she had to work from 42 Broadway, rather than 66 John Street, she provides no basis to conclude that this was related to her disability. Because the plaintiff was transferred into a nonadjudicatory role, it made sense that the plaintiff was transferred from 66 John Street, which was used to house OATH's adjudicatory functions. See SAC Ex. M.

With respect to the plaintiff's demotion, the plaintiff has failed to allege any facts to show that she was demoted because of her disability. The SAC does not provide facts alleging an adequate connection between her disability or requests for accommodation and her demotion. Rather, the SAC shows the lengths to which the defendants went to attempt to accommodate the plaintiff's disability. The defendants moved the plaintiff's workstation several times and arranged a meeting to discuss further possible accommodation. Moreover, as pleaded, the

plaintiff appears to characterize her demotion primarily as retaliation carried out to punish her for speaking out against the DCA and to hinder her ability to prosecute this suit — claims which, as discussed above, lack factual support.

The plaintiff has failed to state a disability-discrimination claim under the ADA or the NYSHRL. Those claims are therefore **dismissed**.

## 2. Discrimination Claims under the NYCHRL

Discrimination claims under the NYCHRL are construed more broadly than those under the ADA or the NYSHRL. Rooney v. WHM LLC, No. 16cv9960, 2017 WL 3482066, at *4 (S.D.N.Y. Aug. 4, 2017). "To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive; 'the NYCHRL does not require . . . materially adverse employment actions . . . .'" Gorokhovsky v. N.Y.C. Hous. Auth., 552 F. Appx 100, 102 (2d Cir. 2014) (quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 114 (2d Cir. 2013)).

Even under the more liberal NYCHRL, the plaintiff has failed to plead sufficient facts to show that she was treated differently based on a discriminatory motive related to her disability, with one exception. The plaintiff alleges that, shortly after she filed her EEOC complaint, which alleged disability discrimination, defendant Matilda Sarpong increased

the plaintiff's workload by making her needlessly retype work and berated her in front of others about her disability to humiliate her. This allegation shows "differential treatment of any degree based on a discriminatory motive." See id. Indeed, Sarpong's acts appear to relate directly to the plaintiff's disability and constitute more than "what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 41 (App. Div. 2009); see Forrester v. Corizon Health, Inc., 278 F. Supp. 3d 618, 627 (E.D.N.Y. 2017), aff'd, No. 17-3592, 2018 WL 5778212 (2d Cir. Nov. 2, 2018). This allegation against Sarpong takes this case beyond a "truly insubstantial" one in which the plaintiff's NYCHRL discrimination claims can be dismissed. See Mihalik, 715 F.3d at 111. Therefore, the plaintiff has stated a disability-discrimination claim against Sarpong and the City of New York under the NYCHRL.

The defendants argue that the plaintiff's discrimination claim must fail because she does not allege that she was treated differently from any similarly situated comparators. However, the defendants do not cite any cases that impose such a requirement at the motion to dismiss stage where a plaintiff alleges disability discrimination under the NYCHRL. The cases the defendants cite are distinguishable. See, e.g., Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)

41

(involving establishing a prima facie discrimination case under Title VII at the summary judgment stage); Canales-Jacobs v. N.Y. State Office of Court Admin., 640 F. Supp. 2d 482, 504 (S.D.N.Y. 2009) (involving establishing a make a prima facie case of employment discrimination based on race under 42 U.S.C. § 1981 at the summary judgment stage); Richardson v. Sunmark Indus., A Div. of Sun Oil Co. of Pa., 560 F. Supp. 733, 736 (E.D.N.Y. 1983) (involving establishing a prima facie case of discriminatory discharge or disparate treatment under Title VII at the summary judgment stage).[12]

The municipal defendants' motion to dismiss is therefore **denied** with respect to the plaintiff's NYCHRL claim against Matilda Sarpong and the City of New York. However, the motion is **granted** with respect to all other municipal defendants.

### D. ADA Failure to Accommodate

The plaintiff alleges that the remaining ADA defendant – the City of New York – failed to accommodate her disability by not allowing her to work from 66 John Street and not providing her with an adequate workstation.

Under a failure-to-accommodate theory, "'discrimination' occurs when an employer does 'not [make] reasonable

---

[12] It is not clear from the papers whether the defendants raise this same comparator defense against the plaintiff's retaliation claim, discussed in Part IV.E.1., infra. If they do, the defense fails for the reasons discussed here.

42

accommodations to the known physical or mental limitations of an otherwise qualified . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business.'" Goonan v. Fed. Reserve Bank of N.Y., 916 F. Supp. 2d 470, 479 (S.D.N.Y. 2013) (alterations in original) (quoting 42 U.S.C. § 12112(b)(5)(A)). Both parties must participate in the accommodation process: "The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." Id. at 480 (alteration in original) (quoting 29 C.F.R. Pt. 1630, App. § 1630.9). The employer incurs liability only when it is responsible for the breakdown of that process. Id.

In this case, the SAC indicates that the defendants attempted to accommodate the plaintiff's request for a suitable workstation by providing her with several different workstations and arranging a meeting to address her continued request for a suitable workstation. On the facts alleged, the defendants cannot be held responsible for any alleged breakdown in the interactive process of reasonably accommodating the plaintiff. The plaintiff has also not stated any facts suggesting that her request to work from 66 John Street was a reasonable one. Rather, as an exhibit attached to her SAC shows, 66 John Street was being used to house the adjudicatory functions of numerous

city agencies, and the plaintiff was transferred out of her adjudicatory role. Moreover, the defendants point out, and the plaintiff does not contest, that shortly after the plaintiff was assigned to work out of 42 Broadway she moved to a residence that was equidistant to 66 John Street and 42 Broadway, obviating her complaint that 66 John Street was closer to her and thus an easier commute than 42 Broadway. See Municipal Defs.' Mem. at 27, Exs. 4-5.

The plaintiff's failure-to-accommodate claim made under the ADA against the City of New York is therefore **dismissed.**

### E. Retaliation

The plaintiff has failed to specify the legal basis for her claim of disability-related retaliation, and she has failed to specify the particular defendants who are accused of retaliating against her. The cause of action reads as follows: "Defendants retaliated against Hon. Viruet because of her request for reasonable accommodation and because of her disabilities." SAC ¶ 145. The briefs on the motion to dismiss are of no help in sorting out this claim.

Nevertheless, construing the allegations generously in favor of the pro se plaintiff, it is possible that the plaintiff is raising a claim of retaliation under the ADA, the NYSHRL, and the NYCHRL. To establish a claim of retaliation because a person has opposed an act or practice that is unlawful under the ADA, a

44

plaintiff must show that "(1) [she] engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). However, "adverse employment actions for retaliation claims encompass a broader pool of events than discrimination claims." Gong v. City Univ. of N.Y., No. 18cv3027, 2019 WL 952340, at *8 (S.D.N.Y. Feb. 27, 2019). "The applicable test in the retaliation context is that a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Vale v. Great Neck Water Pollution Control Dist., 80 F. Supp. 3d 426, 440 (E.D.N.Y. 2015) (quotation marks omitted).

Retaliation claims brought against an employer under the NYSHRL and NYCHRL are treated the same as those brought under the ADA, except that under the NYCHRL the plaintiff "bears a relatively lighter burden. Specifically, retaliation in any manner is prohibited, and [t]he retaliation . . . need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment." Belton v. City of New York, No. 12cv6346, 2014 WL

4798919, at *8 (S.D.N.Y. Sept. 26, 2014) (quotation marks omitted, alterations in original), aff'd, 629 F. App'x 50 (2d Cir. 2015). In assessing a NYCHRL retaliation claim, courts ask "whether a jury could reasonably conclude from the evidence that [the complained-of] conduct [by the employer] was . . . reasonably likely to deter a person from engaging in protected activity, without taking account of whether the employer's conduct was sufficiently deterrent so as to be material[]." Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 723 (2d Cir. 2010) (quotation marks omitted, alterations in original).

Although the ADA does not provide for individual liability, a plaintiff may bring a retaliation claim against individuals under the NYSHRL and the NYCHRL. Henderson v. City of New York, No. 05cv2588, 2011 WL 5513228, at *4 (E.D.N.Y. Nov. 10, 2011). Under the NYSHRL, an individual can be liable "(1) if the defendant has an ownership interest in the employer or has the authority to hire and fire employees, and (2) if the defendant was aiding and abetting the unlawful discriminatory acts of others." Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11cv5528, 2014 WL 4773975, at *34 (E.D.N.Y. Sept. 24, 2014) (quotation marks and citations omitted). "To prevail on a retaliation claim under NYCHRL against an individual defendant, a plaintiff must show that defendant actually engaged in the retaliatory

46

activity. An individual employee, even without supervisory authority, may be liable for retaliation under NYCHRL regardless of ownership or decisionmaking power." Dillon v. Ned Mgmt., Inc., 85 F. Supp. 3d 639, 662 (E.D.N.Y. 2015) (quotation marks and citations omitted).

Parsing through the SAC, it is plain that the plaintiff has alleged that she filed a complaint with the EEOC alleging disability discrimination and that shortly thereafter her supervisor, Matilda Sarpong, allegedly took various actions against the plaintiff including increasing her workload and publicly berating her. This would be sufficient to survive the motion to dismiss a claim of retaliation for opposing disability discrimination and state a claim against the City under the ADA, the NYSHRL, and the NYCHRL, and against Matilda Sarpong under the NYSHRL and the NYCHRL. The plaintiff has failed to allege sufficient facts to assert any other claim of retaliation for allegedly opposing disability discrimination.

Accordingly, the plaintiff's claim for retaliation based on opposing disability discrimination is **dismissed** except for the claim against the City and Matilda Sarpong under the NYSHRL and the NYCHRL, and against the City under the ADA.

### V. The Plaintiff's Hostile Work Environment Claim

The plaintiff does not specify the statute under which she brings her hostile work environment claim. When the motions in

this case were filed and briefed, the Second Circuit Court of Appeals had not yet decided whether hostile work environment claims were cognizable under the ADA. See Berger v. N.Y.C. Police Dep't, 304 F. Supp. 3d 360, 373 (S.D.N.Y. 2018) (quotation marks omitted). However, in the recent case, Fox v. Costco Wholesale Corp., the court determined that such claims can be asserted under the ADA. No. 17-0936-CV, 2019 WL 1050643, at *6 (2d Cir. Mar. 6, 2019). To do so, the plaintiff must plead "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." Id. (quotation marks omitted); see Giambattista v. Am. Airlines, Inc., 5 F. Supp. 3d 284, 294 (E.D.N.Y.), aff'd, 584 F. App'x 23 (2d Cir. 2014). The same general standard also applies to hostile work environment claims brought under the NYSHRL and 42 U.S.C. § 1983. See Lawtone-Bowles v. City of New York, No. 17cv8024, 2019 WL 652593, at *3 (S.D.N.Y. Feb. 15, 2019) (stating that the standard for demonstrating a hostile work environment is the same under the ADA and the NYSHRL); Kennedy v. New York, 167 F. Supp. 3d 451, 460 (W.D.N.Y. 2016) ("The substantive elements of a hostile work environment claim under the NYSHRL are essentially the same as under § 1983.").

"The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility." Leibovitz v. N.Y.C. Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001); see Lambert v. Trump Int'l Hotel & Tower, 304 F. Supp. 3d 405, 425 (S.D.N.Y. 2018).

In this case, the minor, infrequent incidents alleged to have occurred over a few years are not objectively severe or pervasive enough to establish a hostile work environment claim; they do not constitute an abusive work environment. And indeed, to the contrary, the SAC highlights the many steps the defendants took to accommodate the plaintiff's disability. Moreover, the plaintiff does not provide a coherent basis for her hostile work environment claim. She claims that some allegedly hostile acts were in relation to her disability, that others were in relation to her speaking out against DCA policies and similar matters, that some were in relation to both, and fails to specify to what others were in relation. As explained throughout this Opinion, most of the complained-of conduct as pleaded does not bear any relation to either the plaintiff's disability or her speaking out.

The standard for stating a hostile work environment claim under the NYCHRL "is more permissive than under the ADA and

NYSHRL since a plaintiff need only demonstrate by a preponderance of the evidence that [she] has been treated less well than other employees because of [her disability]." Berger, 304 F. Supp. 3d at 373 (quotation marks omitted, alterations in original). However, unlike with her disability-discrimination claim, there is no suggestion in the SAC whatsoever that the plaintiff brings a hostile work environment claim under the NYCHRL. As a result, the defendants had no notice of such a claim and did not brief issues relating to the NYCHRL's more lenient standard. Further, the plaintiff's opposition brief does not mention the NYCHRL. Even construing the SAC favorably, the Court cannot read a NYCHRL hostile work environment claim into the SAC.

The plaintiff's hostile work environment claim is **dismissed.**

## VI. The Plaintiff's Request for Sanctions Against the Defendants

In her opposition brief, the plaintiff purports to move for sanctions against the defendants under Federal Rule of Civil Procedure 11, stating that "[t]here is substantial evidence that defendants pleaded this motion in bad faith, and their legal arguments (including citing cases which do not stand for the matter asserted, ignoring controlling precedent, material false statements and ad hominem attacks) are so untenable as to be deemed frivolous." This is an unsupported and unfair

50

characterization. In any event, a motion for Rule 11 sanctions must be brought in a separate motion, which must be served but not filed or presented to the Court before the other party has had twenty-one days to withdraw the allegedly offending pleading or correct the allegedly offending conduct. Fed. R. Civ. P. 11(c)(2). The plaintiff did not follow this procedure. Her request for Rule 11 sanctions is itself defective. The plaintiff's request for sanctions is **denied.**

## CONCLUSION

For the reasons explained above, the union defendants' motion to dismiss is **granted.** The municipal defendants' motion to dismiss is **granted in part and denied in part**. It is **denied** with respect to the plaintiff's NYCHRL disability-discrimination claim against the City of New York and Matilda Sarpong and her disability-related retaliation claim against the City of New York and Matilda Sarpong. The municipal defendants' motion to dismiss is **granted** with respect to all other claims. The plaintiff's request for sanctions is **denied.**

The Court has considered all the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

The Clerk is directed to close Docket Numbers 20, 73, and 77.

**SO ORDERED.**

**Dated:**     **New York, New York**
            **May 3, 2019**

_____

John G. Koeltl
United States District Judge